IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-01455-MEH

JOSEPHINE E. BENAVIDEZ,

      Plaintiff,

v.

CAROLYN COLVIN, Acting Commissioner of the Social Security Administration,

      Defendant.

---

## ORDER

---

**Michael E. Hegarty, United States Magistrate Judge**.

      Plaintiff, Josephine E. Benavidez, appeals from the Social Security Administration ("SSA") Commissioner's final decision denying her application for disability insurance benefits ("DIB"), filed pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401-433, and her application for supplemental security income benefits ("SSI"), filed pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383c.  Jurisdiction is proper under 42 U.S.C. § 405(g).  The parties have not requested oral argument, and the Court finds it would not materially assist the Court in its determination of this appeal.  After consideration of the parties' briefs and the administrative record, the Court **AFFIRMS** the ALJ's decision and the Commissioner's final order.

## <u>BACKGROUND</u>

### I.    Procedural History

      Plaintiff seeks judicial review of the Commissioner's decision denying her application for

DIB and SSI benefits filed July 27, 2010.  [AR 54, 258]  Plaintiff initially alleged her disability

began May 5, 2010, but later amended the alleged onset of disability to June 10, 2011.  *Id.*  After

the application was initially denied on November 16, 2010 [AR 54-64], an Administrative Law

Judge ("ALJ") upon the Plaintiff's request scheduled a video hearing on November 26, 2012, with

the ALJ presiding from Chicago, Illinois, and with Plaintiff appearing in Pueblo, Colorado.  [AR 54]

An impartial medical expert and an impartial vocational expert both testified at the hearing.  *Id.*  The

ALJ issued a written ruling on January 9, 2013, finding that Plaintiff was not disabled since June

10, 2011, because considering Plaintiff's age, education, work experience and residual functional

capacity ("RFC"), there were jobs existing in significant numbers in the national economy that

Plaintiff could perform.  [AR 54-64]  The SSA Appeals Council subsequently denied Plaintiff's

administrative request for review of the ALJ's determination, making the SSA Commissioner's

denial final for the purpose of judicial review.  [AR 1-4]  *See* 20 C.F.R. § 416.1481.  Plaintiff timely

filed her complaint with this Court seeking review of the Commissioner's final decision.

## II.   Plaintiff's Alleged Conditions

Plaintiff was born on September 1, 1963; she was 46 years old when she filed her application

for SSI and DIB benefits on July 6, 2010.  [AR 54, 254-261]  Plaintiff's initial application for DIB

indicates generally that she became "unable to work because of [her] disabling condition"  and that

she was "still disabled." [AR 254]  Her application for SSI claims that her disability began on May

5, 2010.  [AR 258]  She later amended that date to June 10, 2011.  [AR 54]  She has a high school

diploma and a year of education at community college, where she received a welder certification.

[AR 74]  In the past, she worked as a forklift operator, purchasing agent, assembly technician, and

2

office manager.  [AR 96]

A.     Physical Conditions

Plaintiff has degenerative disc disease in the cervical spine, carpal tunnel syndrome in the wrists, partial thickness damage in the right shoulder post dislocation, and a history of cerebral aneurysm.  Opening Brief, docket #14.[1]

Plaintiff reported numbness and pain starting in 2005 in her neck in the years leading up to her alleged disability.  [AR 359]  She reported, however, that the pain had improved and she "was doing fairly well" until 2007, but the pain began worsening.  *Id.*  Medical records from early 2009 show that Plaintiff experienced degenerative disc disease at two levels.  [AR 424-25]

The medical record shows x-rays revealing mild degenerative changes in her right wrist.  [AR 365-66]  She also reported ongoing pain in her right arm to her primary care doctor, Cheryl Wills, D.O.  [AR 432]  While her wrist presented with tenderness and some swelling, her elbow appeared normal and she had a normal neurovascular exam.  *Id.*  Kenneth Danylchuck, M.D. treated her with an injection for arm pain in May 2010.  [AR 382]  In the same month, Dr. Wills found Plaintiff to have full range of motion in her elbow, slightly decreased right wrist range of motion and some tenderness and a weak grip, but the doctor found no sensory or motor deficits.  [AR 431.]  A few months later, in August 2010, another doctor in Dr. Wills's office found Plaintiff had full motor

---

[1]Because Plaintiff's SSI and DIB applications did not provide specificity regarding her conditions, the Court relies on descriptions provided by Plaintiff in her Opening Brief, in which Plaintiff uses the ALJ's list of physical and mental conditions without any argument that the ALJ misrepresented the portrayal of the conditions themselves.  *See* AR 254-262; *but see* Opening Brief, docket #14 at 2.  Thus, the Court uses those descriptions, which are consistent with the medical records in the administrative record.

strength in her arms and legs, intact sensation, and normal reflexes.  [AR 429]  A month later, in

September 2010, a community health center doctor examined her for pain in her right arm, but that

doctor noted that he could not fully examine her as she "really does not want to move that hand or

forearm or elbow much at all" so he "cannot tell how much is real and how much is some symptom

magnification."  [AR 495]  The next month, in October 2010, Plaintiff had an appointment with

Robert Thomas, M.D., regarding her right arm pain; he noted, "my concern also though is she is

very emotional and overreacts to all of her symptoms, and it is difficult to determine how severe the

pain level really is."  [AR 526]  Months later, in March 2011, the same doctor noted that Plaintiff's

neurological studies and x-rays were all normal and that he would not pursue surgery because she

had not gone to physical therapy, "so all in all there is nothing I have to offer her."  [AR 500]

Eventually, Plaintiff did go to physical therapy, as the records show by July 2011. [AR 488] At that

point, she was using physical therapy, pain medication, and a wrist brace to treat her pain.  *Id.*

In November 2011, Plaintiff went to Dr. Jan Davis at Parkview Orthopedics complaining of

shoulder pain.  [AR 465-66]  Late that year and into early 2012, she went to Dr. Davis again for the

shoulder pain; Dr. Davis found diffuse tenderness and breakaway weakness but full range of motion

and strength.  [AR 465-67] In January 2012, Dr. Davis attempted to give Plaintiff an injection when

seen about the shoulder pain, but the doctor could not do so because of what she reported as

Plaintiff's "theatrical moaning, shouting and squirming." [AR 498] Plaintiff had an MRI in January

2012 that showed partial tears of two shoulder tendons and moderate osteoarthritis and bursitis.  [AR

471-72]  She had surgery in March 2012 to repair the shoulder.  [AR 536-37]

Plaintiff also has a family history of aneurysms, including her mother dying at age 45 from

that condition.  [AR 85, 368] Plaintiff also had substance abuse issues, reporting that she would drink six-to-12 beers on a Friday or Saturday and also use cocaine at times, both of which she said she stopped because of concerns it would harm her custody battle, which included random drug testing.  [AR 84, 90]

B.    Mental Conditions

Plaintiff has the following mental impairments: mild cognitive impairment, depression, and anxiety.  Opening Brief, docket #14.

Plaintiff annually in 2007-09 reported depression and anxiety to her primary care doctor. [AR 437, 449, 451] She went to her primary care doctor, Dr. Wills, presenting with a migrane in January 2010; the doctor noted that "she is under a tremendous amount of stress here recently too because of legal issues with her divorce and custody of her son, etc." [AR 393]  In March 2010, she had chest pain so went to the emergency room, where doctors diagnosed her as having an anxiety attack and noted that she reported having anxiety in the last two years related to a divorce and "custody dispute with husband," with the medical record concluding symptoms were likely "related to emotional stress."  [AR 367-69, 378, 433] In August 2010, she told her primary care doctor that she was having financial and family troubles and feeling depressed.  [AR 429] The doctor noted that he thought she had chronic depression and that she had stress involving custody issues; he therefore recommended additional medication and pastoral counseling. [AR 388, 429-30]

III.   **Medical Source Opinions**

No treating physician conducted an RFC assessment in this case. [AR 61] However, a consultative examiner, psychologist Dr. Richard Madsen, completed an assessment of Plaintiff's

psychological limitations.   [AR 60]   Additionally, a State of Colorado agency pyschological

consultant, Dr. Arthur Lewy, reviewed Dr. Madsen's report and provided his assessment to the ALJ.

*Id*.  Finally, a third doctor – a medical expert – testified at the hearing.   *Id*.

> A.      Richard Madsen, Ph.D.

As part of the administrative proceedings, psychologist Dr. Richard Madsen evaluated

Plaintiff in November 2010.  [AR 76, 403-07]  Plaintiff reported the following:

> The client has chronic pain, rates the level of it as 7/10.  She has [had] it [for] 14
> years and it is getting worse over the years.  She has cerebral aneurysm and "severe
> anxiety."  She has panic attacks about three times a month.  She states they are
> especially "when I am under a lot of stress."  She complains of depression and rates
> the depression at 6/10.  She states she gets anxious and has a feeling of emptiness.

[AR 403].  Plaintiff said she has one close friend, is involved in church and family activities, spends

her days doing self care, receives unemployment, drives a car, and does the laundry and grocery

shopping. [AR 404] She reported that she had worked in purchasing and in the manufacturing field,

in data entry, human resources, and payroll, with the longest-held job being seven years and her

most recent job ending in May of 2010 (the current year she met with the doctor).  *Id*.

The doctor found her affect to be consistent with an anxious, depressed mood.  [AR 406]

Her thought processes were found to non-psychotic, with logical and relevant thought content and

no evidence of flights of ideas, loosening of associations, or delusions.  *Id*.  She was able to count

from one by threes to 40 accurately without errors and recall three of three objects on immediate

recall and after five minutes.  *Id*.  Her short-term auditory memory was found to be impaired as was

her ability to do arithmetic functions in her head; she could calculate the price of six objects given

the price of one being 25 cents, but she was unable to do more difficult calculations.  *Id*.  The doctor

6

found her level of intellectual functioning to be "in borderline range" and that her "fund of knowledge is impaired." *Id.*

The doctor diagnosed her with dysthymic disorder and mild cognitive impairment. [AR 406-07]  He noted that Plaintiff reported she has "arthritis, tendonitis, carpal tunnel syndrome, hypothyroidism, cerebral aneurysm, and degenerative disc disease." [AR 407]  Dr. Madsen assessed her a GAF score of 55.[2]

---

[2]In *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1162 n.1 (10th Cir. 2012), the Tenth Circuit describes the GAF as follows: The GAF is a 100-point scale divided into ten numerical ranges, which permits clinicians to assign a single ranged score to a person's psychological, social, and occupational functioning. *See* American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32, 34 (Text Revision 4th ed. 2000). GAF scores are situated along the following "hypothetical continuum of mental health [and] illness":
• 91–100: "Superior functioning in a wide range of activities, life's problems never seem to get out of hand, is sought out by others because of his or her many positive qualities. No symptoms."
• 81–90: "Absent or minimal symptoms (e.g., mild anxiety before an exam), good functioning in all areas, interested and involved in a wide range of activities, socially effective, generally satisfied with life, no more than everyday problems or concerns (e.g., an occasional argument with family members)."
• 71–80: "If symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork)."
• 61–70: "Some mild symptoms (e.g., depressed mood and mild insomnia), OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."
• 51–60: "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."
• 41–50: "Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."
• 31–40: "Some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child beats up younger children, is defiant at home, and is failing at school)."

and concluded:

> She has multiple medical problems with chronic pain. She also has a cerebral aneurysm. Her mother died from a cerebral aneurysm at the age of 45. This causes the client's considerable anxiety. At times, she has panic attacks. She is depressed and [has] difficulty maintaining focus and concentration, energy, and motivational levels. Cognitive functioning appeared mildly impaired, most likely due to anxiety. Her ability to do work-related activities is impaired because of these things. She will have difficulty maintaining a regular work schedule, focusing and concentrating on work, relating to peers, co-workers, supervisors and the general public. The client should be able to handle her own funds.

*Id.*

    B.    <u>Arthur Lewy, Ph.D.</u>

Also as part of the administrative proceedings, the Commissioner's non-examining agency

doctor, Arthur Lewy, Ph.D., reviewed Plaintiff's medical records, including Dr. Madsen's report,

and issued findings.[3]  [AR 105-31]

Dr. Lewy indicated that Plaintiff had mild restriction of activities of daily living, moderate

---

• 21–30: "Behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends)."
• 11–20: "Some danger of hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement) OR occasionally fails to maintain minimal personal hygiene (e.g., smears feces) OR gross impairment in communication (e.g., largely incoherent or mute)."
• 1–10: "Persistent danger of severely hurting self or others (e.g., recurrent violence) OR persistent inability to maintain minimal personal hygiene OR serious suicidal act with clear expectation of death."
• 0: "Inadequate information."

    [3]The record includes Dr. Lewy's finding both for Title II and Title XVI. [AR 102-31] They are nearly identical. The Court has cited to the Title II records but notes the record has the same findings for Title XVI. [*Id.*]

difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace.  [AR 109]  He concluded that Plaintiff had exertional limits because of her right arm pain and carpal tunnel syndrome, but even with that taken into consideration, he noted that she could lift and/or carry or pull 20 pounds occasionally (cumulatively one-third or less of an eight-hour day), and that she could stand and/or walk and/or sit more than six hours on a sustained basis in an eight-hour work day.  [AR 111]  He noted that she has manipulative limitations involving her right hand regarding gross and fine manipulation, concluding that "right hand is limited to occasional handling and fingering."  [AR 112]  He also reviewed her environmental limitations, concluding she could handle extreme heat, wetness, humidity, noise, fumes and odors, but she should avoid concentrated exposure to extreme cold, vibration, and hazards such as machinery and heights.  [AR 112]

Regarding Plaintiff's understanding and memory, Dr. Lewy found that she was moderately limited in understanding and remembering detailed instructions but not significantly limited in her ability to remember locations and work-like procedures or the ability to understand and remember very short and simple instructions, including those of one-to-four steps.  [AR 113]  Further, regarding sustained concentration and persistence limitations, Dr. Lewy found Plaintiff was moderately limited in the ability to carry out detailed instructions and to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length or rest periods.  *Id.*  However, he found Plaintiff not significantly limited in the following areas: the ability to carry out very short and simple instructions; to maintain attention and concentration for extended periods; to perform

activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to sustain an ordinary routine without special supervision; to work in coordination with or in proximity to others without being distracted by them; and to make simple work-day decisions. *Id.*

Socially, Dr. Lewy found that Plaintiff was moderately limited in her ability to interact appropriately with the general public. [AR 114]  Yet, he found her not significantly limited in the following areas: the ability to ask simple questions or request assistance; to accept instructions and respond appropriately to criticism from supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and to maintain socially appropriate behavior and adhere to basic standards of cleanliness.  *Id.* Overall, Dr. Lewy noted Plaintiff "is able to work with the public on a cursory basis" and "[s]he is able to work with co-workers and supervisors."  Dr. Lewy noted that Plaintiff was moderately limited in her ability to respond appropriately to changes in the work setting, but that she "is able to adapt to the normal changes in the workplace [and] able to cope with the usual stress[o]rs and changes that occur in a work environment."  *Id.*

Based on Dr. Lewy's review of the record, he determined her to be "not disabled." [AR 116] He noted that Plaintiff could work in the following three jobs in the national economy: bakery worker/conveyor line; cotton classer aide; or ironer.  [AR 130]   His personalized decision notice reads as follows:

> You said you have been unable to work due to arthritis, tendonitis, carpel tunnel in right arm, thyroid, cerebral aneurysm, degenerative discs in neck, anxiety and depression.  The medical evidence shows you have received treatment for your conditions.  You have a history of arthritis and pain in your right hand.  You have degenerative disease in your neck.  Records show a diagnosis of cerebral aneurysm

that is being monitored.  Although you have some discomfort, you are able to move about satisfactorily.  You are able to follow one and two step instructions.  You are able to take care of yourself and your daily needs.  The medical evidence shows you are not able to perform the type of work you have done in the past, however you can perform other types of work.  Therefore, your claim is denied. Your condition results in some limitations in your ability to perform work related activities.  While you are not capable of performing work you have done in the past, you are able to perform work that is less demanding.  We have determined that your condition is not severe enough to keep you from working. We considered the medical and other information, your age, education, training, and work experience in determining how your condition affects your ability to work.

[AR 116-17]

Regarding Plaintiff's credibility, Dr. Lewy concluded she was "partially credible": that the medical records legitimize her arm pain although not to the high level she reported it (as a seven out of ten); that her claims that she can only walk two blocks are not supported by the record; and that her claim of three panic attacks per month as of November 2010 was not mentioned at her primary care appointment in August 2010 when she reported her increased depression.  [AR 110]

C.    Dr. Ellen Rosenfeld

At the administrative hearing, medical expert and psychologist Dr. Ellen Rosenfeld testified.[4] [AR 68, 88-95] She indicated that Plaintiff had the following mental impairments: mild cognitive impairment, depression, anxiety, and some substance abuse.  [AR 91]  As to work limitations, she noted that Plaintiff could handle simple, routine, and occasionally detailed but not complex

---

[4]The Court notes that the subsequent section of this order focuses on the hearing testimony; however, as one of the main issues in this appeal involves the opinions of the medical experts and the weight the ALJ gave them, the Court summarizes Dr. Rosenfeld's testimony in its synopsis of medical source testimony in the record.  Note also that Dr. Rosenfeld's actual credentials are not provided in the record, for example, whether she is a Ph.D.; the record merely indicates "Dr. Ellen Rosenfeld." [AR 88]

instructions and tasks; could be in proximity to the general public but it would be best if that contact

was not sustained; and could be in proximity to coworkers and handle unlimited supervisory conduct

but would do best without joint or shared tasks.  [AR 92-94]  Further, she indicated that Plaintiff

would do best in a work situation with only routine changes, defined as interacting with the general

public up to one-third of the day, and noted that she could handle semi-skilled jobs.  [AR 92-95]

## IV.    Hearing Testimony

The ALJ held an administrative hearing on November 26, 2012.  [AR 65]  Plaintiff was

represented by counsel.  [AR 67]

Plaintiff testified at the hearing.  [AR 74-88]  She indicated that she had a job up until May

2010 as an administrative assistant but said that she can no longer do that job because if she sits too

long, her arthritis affects her and if she uses her right arm too much it gets stiff.  [AR 75]  In

answering questions posed by the ALJ, Plaintiff said she can lift five pounds, walk about a block

and a half, and stand for 40 minutes, but she cannot "function before 10:00 because [her] body just

aches so bad."  *Id*.  Plaintiff acknowledged that she collected unemployment and had been actively

looking for work during that time, as required for receipt of unemployment benefits, up until the end

of May 2012.  [AR 78]  She stopped looking because she was incarcerated for driving under

revocation.  *Id*.  She had been incarcerated one other time, in September 2011, for driving while

intoxicated, but indicated that she stopped drinking because of concerns it would affect her custody

battle.  *Id*.  She noted she receives food stamps, Medicaid, aid through the state, and child support.

*Id*.  She drives a 1995 Ford Explorer that she had just purchased, and she straightens her house,

cooks, goes for walks and to church, does stretching exercises three times a week, visits family next

12

door, goes to the post office, and watches the news.  [AR 78, 82-83] She testified that medications

help with her pain.  [AR 84]

When asked why she cannot work any kind of job, she responded:

Well, like right now, just sitting here, my bone in my arm is just killing me.  It just aches all the time and just sitting or standing or doing, like I just ache all the time. Sometimes I wake up with headaches.  I can't sleep through the night.  I have anxiety.  In the night, I wake up with my chest so heavy.  I've been in the hospital for an anxiety attack, a severe anxiety attack.  I had to stay overnight at that time at Parkview Hospital . . . three or four years ago."

[AR 80-81]

Dr. Rosenfeld also testified at the hearing, as summarized *supra*.  Plaintiff's counsel cross

examined Dr. Rosenfeld at the hearing and asked if she acknowledged that Plaintiff was admitted

to the hospital for anxiety-related issues.  [AR 92-93] Dr. Rosenfeld indicated that she did and noted

that Plaintiff presented with chest pain, noting psychosocial stressors, increased anxiety, diagnosed

with anxiety/depression.  *Id*.  She continued: "I'm not sure I noted any subsequent hospitalization

or ER visits.  I mean, that, in my guess, doesn't constitute an episode of decompensation.  It needs

to be of an extended duration."  *Id*.

Before the medical expert ("ME") finished testifying, the ALJ verified with her the type of

work that she thought Plaintiff could do:

ALJ: I just want to verify though, for the hypotheticals that I give the [vocational expert], you did say limited – occasional interaction, that's up to one-third of the day – with the general public?  Is that --

ME: Yes.

ALJ: – correct, doctor?  Okay.  And with supervisors, unlimited, no limitations there?  With coworkers, did you say not on the same project but in –

ME: Right.

ALJ: – proximity is okay?

ME: Yes.

ALJ: Okay.  And I didn't quite understand, you said she'd be best limited to simple, routine but she could handle detailed tasks.  Is that right?

ME: No.  She could handle simple, routine tasks, as well as occasional detailed tasks.  She cannot handle detailed tasks.  She cannot handle complex tasks.

ALJ: Okay.

ME: So she can't (inaudible) only to simple, routine tasks.  Cognitively, she's capable of handling some detailed work; however, with regards to adaptation, she would do best in a situation with only routine changes so that may, in [e]ffect, limit her to tasks of a more simple, routine nature.

ALJ: Could she do –

ME: – (inaudible) to address.  Cognitively, she could handle possibly more detailed instructions based on her mental status exam.

ALJ: Okay.  Could she handle semiskilled and skilled jobs?

ME: She can handle semiskilled but not skilled.

ALJ: Okay.  All right.  I think that's the only clarification I needed.

[AR 94-95]

A vocational expert ("VE"), Ms. Everts[5], also testified.  [AR 95-100]  She indicated that Plaintiff had relevant past work as an office manager, purchasing agent, forklift operator, and assembly technician.  *Id*.  The ALJ gave the VE the following hypothetical:

Assume an individual of the age of 46 to 49, one year of college and the past relevant

---

[5]The record does not provide a first name for the VE, calling her only "Ms. Everts."

work experience of the Claimant and assume that this individual can lift up to 10 pounds frequently, 10 pounds occasionally, can stand two out of eight hours, sit six out of eight hours, unlimited in pushing and pulling and, cognitively, she can perform simple, routine tasks and occasional detailed tasks. ... [T]hat means she can perform some semiskilled tasks.  Unlimited supervision or unlimited contact with supervisors, working in close proximity with coworkers but not on [the] same projects, and occasional contact with the general public, meaning up to one third of the day.

[AR 96]  The VE testified that the individual could not perform Plaintiff's past relevant work but could perform other jobs existing in significant numbers in the national economy, including that of a surveillance monitor, a charge account clerk, and a packer.  [AR 97]

The ALJ issued an unfavorable decision on January 9, 2013.  [AR 54-64]

## LEGAL STANDARDS

### I.      SSA's Five-Step Process for Determining Disability

To qualify for benefits under sections 216(I) and 223 of the SSA, an individual must meet the insured status requirements of these sections, be under age 65, file an application for DIB and/or SSI for a period of disability, and be "disabled" as defined by the SSA.  42 U.S.C. §§ 416(I), 423, 1382. Additionally, SSI requires that an individual meet income, resource, and other relevant requirements.  *See* 42 U.S.C. § 1382.

Here, the Court will review the ALJ's application of the five-step sequential evaluation process used to determine whether an adult claimant is "disabled" under Title II and Title XVI of the Social Security Act, which is generally defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period

of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(B); *see also Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).

Step One determines whether the claimant is presently engaged in substantial gainful activity.  If she is, disability benefits are denied.  *See* 20 C.F.R. §§ 404.1520, 416.920.  Step Two is a determination of whether the claimant has a medically severe impairment or combination of impairments as governed by 20 C.F.R. §§ 404.1520(c), 416.920(c).  If the claimant is unable to show that her impairment(s) would have more than a minimal effect on her ability to do basic work activities, she is not eligible for disability benefits.  *See* 20 C.F.R. 404.1520(c).  Step Three determines whether the impairment is equivalent to one of a number of listed impairments deemed to be so severe as to preclude substantial gainful employment.  *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).  If the impairment is not listed, she is not presumed to be conclusively disabled.  Step Four then requires the claimant to show that her impairment(s) and assessed residual functional capacity ("RFC") prevent her from performing work that she has performed in the past.  If the claimant is able to perform her previous work, the claimant is not disabled.  *See* 20 C.F.R. §§ 404.1520(e), (f), 416.920(e) & (f).  Finally, if the claimant establishes a *prima facie* case of disability based on the four steps as discussed, the analysis proceeds to Step Five where the SSA Commissioner has the burden to demonstrate that the claimant has the RFC to perform other work in the national economy in view of his age, education and work experience.  *See* 20 C.F.R. §§ 404.1520(g), 416.920(g).

## II.    Standard of Review

This Court's review is limited to whether the final decision is supported by substantial

evidence in the record as a whole and whether the correct legal standards were applied. *See Williamson v. Barnhart*, 350 F.3d 1097, 1098 (10th Cir. 2003); *see also White v. Barnhart*, 287 F.3d 903, 905 (10th Cir. 2001). Thus, the function of the Court's review is "to determine whether the findings of fact ... are based upon substantial evidence and inferences reasonably drawn therefrom. If they are so supported, they are conclusive upon the reviewing court and may not be disturbed." *Trujillo v. Richardson*, 429 F.2d 1149, 1150 (10th Cir. 1970); *see also Bradley v. Califano*, 573 F.2d 28, 31 (10th Cir. 1978). "Substantial evidence is more than a scintilla, but less than a preponderance; it is such evidence that a reasonable mind might accept to support the conclusion." *Campbell v. Bowen*, 822 F.2d 1518, 1521 (10th Cir. 1987) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The Court may not re-weigh the evidence nor substitute its judgment for that of the ALJ. *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008) (citing *Casias v. Secretary of Health & Human Servs.*, 933 F.2d 799, 800 (10th Cir. 1991)). However, reversal may be appropriate when the ALJ either applies an incorrect legal standard or fails to demonstrate reliance on the correct legal standards. *See Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996).

## **ALJ's RULING**

The ALJ ruled that Plaintiff is capable of activities at the sedentary exertional level with additional limitations. [AR 56] Going through the five-step process, the ALJ found that the claimant had not engaged in substantial gainful activity since June 10, 2011, the alleged onset date (Step One). [AR 57] Further, the ALJ determined that Plaintiff had the following severe impairments: degenerative disc disease in the cervical spine, carpal tunnel syndrome, partial thickness damage in the right shoulder post dislocation, mild cognitive impairment, depression,

anxiety, status post cerebral aneurysm, and polysubstance abuse (Step Two). *Id.* Next, the ALJ

found that Plaintiff did not have an impairment or combination of impairments that met or medically

equaled a listed impairment deemed to be so severe as to preclude substantial gainful employment

(Step Three). *Id.* The ALJ then determined that Plaintiff had the RFC to perform:

> sedentary work ... meaning that the claimant is capable of lifting or carrying up to 10 pounds frequently, lifting or carrying 10 pounds occasionally, standing or walking two hours in an eight-hour workday, and sitting six hours in an eight-hour workday. The claimant is capable of simple, routine, and repetitive tasks and occasional detailed tasks (up to one third of the day).  The claimant is capable of interaction with the public for up to one third of the day and unlimited interaction with supervisors and co-workers.  The claimant is capable of working in close proximity to co-workers, but not on the same task.

[AR 59]  After "careful consideration of the evidence," the ALJ determined that the record reflects

Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged

symptoms; however, the claimant's statements concerning the intensity, persistence and limiting

effects of these symptoms are not entirely credible."  [AR 60]  The ALJ went on to explain that

credibility of Plaintiff was affected by her testimony of her activities of daily living, including doing

housework, making lunch, grocery shopping with her boyfriend, driving a car, playing cards,

completing paperwork, watching the news, using exercise bands, and walking to church (two-to-

three blocks away from her home).  [AR 60-61]  The ALJ also indicated that doctors have found

Plaintiff's arm pain to be of unknown etiology and she seems to have symptom magnification.  [AR

61]  The ALJ discussed the weight given to the various medical opinions, discussed *infra*. [AR 61-

62]

    The ALJ went on to determine that Plaintiff is unable to perform any past relevant work

18

(Step Four), and that considering Plaintiff's age, education, work experience and residual functional capacity, Plaintiff could perform the jobs existing in significant numbers in the national economy. [AR 62]  As a result, the ALJ concluded (at Step Five) that Plaintiff was not disabled and, therefore, was not under a disability as defined by the SSA.  [AR 64]

Plaintiff sought review of the ALJ's decision by the Appeals Council on January 22, 2013. [AR 48]  Plaintiff submitted additional evidence to the Appeals Council as part of the review process.  [AR 5]  On April 3, 2014, the Appeals Council notified Plaintiff that it had determined it had "no reason" under the rules to review the decision and, thus, the ALJ's decision "is the final decision of the Commissioner of Social Security."  [AR 1-5]  Plaintiff timely filed her Complaint in this matter on May 23, 2014.

## ISSUES ON APPEAL

On appeal, Plaintiff alleges the following issues: (1) the ALJ did not account for all of the restrictions in the medical opinions, which were given great weight; and (2) the ALJ did not properly assess the credibility of Plaintiff's testimony.

## ANALYSIS

### I. Whether the ALJ Accounted for all of the Restrictions in the Medical Opinions, which were Given Great Weight

Plaintiff argues that the ALJ did not appropriately account for all of the restrictions in the three medical opinions, even though the ALJ indicated they were given great weight.  Opening Brief, docket #14 at 10.  Defendant disagrees and indicates that all three medical opinions essentially concurred, and the ALJ's reasoning was sound and based on substantial evidence.  Response, docket

#15 at 14.

"[A]n ALJ must evaluate every medical opinion in the record." *Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir. 2004) (citing former 20 C.F.R. § 404.1527(d)); *see also* 20 C.F.R. § 416.927(c). Furthermore, the social security regulations state that, unless the treating source opinion is given controlling weight (which did not occur here), the ALJ "must" explain in the decision the weight given to the opinions of state agency medical or psychological consultants.  20 C.F.R. § 404.1527(e)(2)(ii).  The social security rulings require that an ALJ "may not ignore [the opinions of state agency consultants,] and must explain the weight given to these opinions in their decisions." SSR 96-6P, 1996 WL 374180, at *1 (July 2, 1996).

Plaintiff also argues that the ALJ did not discuss the differences between his RFC and Dr. Rosenfeld's opinion and erred in picking and choosing through the opinion for support of her decision.  As to "differences," Plaintiff cites *Winfrey v. Chater*, 92 F.3d 1017, 1024 (10th Cir. 1996) for the proposition that "[t]he ALJ must explain **any difference** between the ALJ's RFC finding and the physician's RFC opinion."  Opening Brief, docket #14 at 13 (emphasis in original).  However, in *Winfrey* (at the page cited by Plaintiff), the Tenth Circuit discussed an ALJ's duties in evaluating a claimant's mental impairments by using the specific procedure set forth in 20 C.F.R. § 404.1520a. *Id.*  After finding that the ALJ failed to relate his conclusions to evidence in the case, the Tenth Circuit noted "the ALJ's conclusions as to plaintiff's abilities differed dramatically from Dr. Spray's conclusions; a difference which the ALJ did not explain." *Id.*  The Court does not accept Plaintiff's proposition based upon such "note" in *Winfrey* and, rather, infers from the "note" that the Tenth Circuit would require an ALJ to relate his/her conclusions to the evidence in the case, and to explain

20

any "dramatic" differences between the ALJ's conclusions and the doctor's opinion.

Here, the ALJ related her conclusions to the evidence in the case, specifically giving great

weight to all the medical opinions and not discounting any of them:

> The undersigned affords great weight to Dr. Madsen's opinion and the State agency psychological consultant's opinion regarding the claimant's mental functioning. The medical evidence of record supports these opinions. The undersigned also affords great weight to Dr. Rozenfeld's[6] testimony because it it consistent with the consultative examiner's opinion and the State agency consultant's assessment." [AR 62] These professionals opine that the claimant remains capable of simple, routine, and repetitive tasks and some detailed tasks. She is capable of interacting with supervisors, but she has some limitations in interaction with the general public. She is capable of working in proximity to others, but not on the same tasks. Upon examination, the claimant exhibits symptoms of a mild cognitive disorder causing limitations with concentration, persistence and pace. She also reports anxiety and some panic attacks. Her physicians note that the claimant's depressive symptoms increased because of familial and financial factors, and improved with treatment. The claimant completes her activities of daily living, interacts with others on a daily basis, and attends church regularly. She goes for walks, shops in the grocery store, likes to play cards, and watch television daily. Thus, the evidence supports the assessments listed above.

[AR 61-62]

Plaintiff asserts, however, that while the ALJ stated that she gave great weight to all three

medical opinions, she actually did not, instead relying on only one of the three in her RFC finding.

Opening Brief, docket #14 at 12. Plaintiff specifically argues that the ALJ did not accept Dr.

Lewy's opinion that Plaintiff can only understand one-to-four-step instructions (rather the ALJ

prohibited only "complex" instructions), or Dr. Lewy's opinion that Plaintiff is only able to work

with the public on a "cursory basis" (rather the ALJ allowed dealings with the public for one-third

---

[6]The ALJ spelled Dr. Rosenfeld's name using a z, but all the other records use s; the Court thus has chosen to spell the doctor's name to align with the briefs from both parties.

of the day). *Id.* Further, Plaintiff notes that the ALJ did not accept Dr. Madsen's opinion that Plaintiff will have difficulty maintaining a regular work schedule, focusing, or relating to supervisors (as the ALJ allowed Plaintiff to have "unlimited interaction with supervisors"). *Id.* at 13.

Defendant counters – and the Court agrees – that the ALJ did consider and weigh all of the medical expert testimony. The ALJ evaluated all three of the experts, giving none controlling weight but all three "great weight," citing specifically to the reports of Dr. Lewy and Dr. Madsen and indicating the alignment of those opinions with that of Dr. Rosenfeld. She then noted, referring it appears to all three of the doctors, that "[t]hese professionals opine" the Plaintiff had limitations consistent with those adopted in the ALJ's RFC finding.

She indicated that she gave great weight to Dr. Lewy and cited his report, which opined that Plaintiff had moderate limitations in her ability to understand, remember, and carry out detailed instructions but that should could remember locations, handle work-like procedures, and remember one-to-four-step instructions, and maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, and sustain an ordinary routine without special supervision. Dr. Lewy also said that Plaintiff had moderate limitations in her ability to interact with the public, but that she could do so on a cursory basis, noting that she "is able to work with co-workers and supervisors." More specifically, Dr. Lewy said she had the ability to ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers. Ultimately, Dr. Lewy found her to be "not disabled."

Meanwhile, the ALJ said she gave great weight to Dr. Madsen's opinion and cited his report,

which indicated Plaintiff was depressed and had considerable anxiety.  Dr. Madsen noted she has "[d]ifficulty maintaining focus and concentration, energy, and motivational levels" and that "[s]he will have difficulty maintaining a regular work schedule, focusing and concentrating at work, relating to peers, co-workers, supervisors and the general public."  Dr. Madsen did not provide any explanation for what a difficulty would look like or how problematic that would be; however, he assessed Plaintiff's a GAF score of 55, which is higher than category that indicates the person is unable to keep a job.

The ALJ additionally gave great weight to Dr. Rosenfeld's opinion, which similarly found the Plaintiff could not handle the same jobs she did previously, but could handle other jobs as indicated *supra*.  While Plaintiff argues that the ALJ provided no basis for understanding the relative weights she assigned the opinions, Defendants assert a valid reason for that: the opinions in essence concur.

Overall, the ALJ's conclusions did not differ dramatically from any of the three medical opinions; they all were, in fact, closely aligned.  The ALJ indicated she accepted all of the opinions and they all aligned with the larger medical record, which included analysis of the Plaintiff by many doctors over many years.  Although there are differences between the various doctors' opinions and the ALJ's conclusions, the differences certainly are not dramatic, and the ALJ's conclusions are consistent with the objective medical evidence.  Further, the ALJ here did provide good reasons to explain the evidentiary support for her RFC determination.

Plaintiff also argues that the hypothetical used by the vocational expert ("VE") was flawed in that the "ALJ's error [in not explaining the relative weight of the medical-source opinions] tainted

the VE's opinion of the number of jobs that survive the restrictions in the ALJ's RFC finding."

Opening Brief, docket #14 at 14.  Because the Court finds the ALJ committed no such error, it need

not address this argument.

In sum, the Court finds the ALJ properly accounted for the restrictions in the medical

opinions that were given great weight.

## II.    Whether the ALJ Improperly Assessed the Credibility of Plaintiff's Testimony

Plaintiff claims that the ALJ did not properly assess the credibility of Plaintiff's testimony.

Opening Brief, docket #14 at 15.

"[I]t is well settled that administrative agencies must give reasons for their decisions." *Reyes*

*v. Bowen*, 845 F.2d 242, 244 (10th Cir. 1988).  When determining whether the claimant's pain is

credible, the ALJ must consider assertions of severe pain and decide whether the ALJ believed them.

*Kepler v. Chater*, 68 F.3d 387,  391 (10th Cir. 1995).  To do this, the ALJ should consider factors

such as:

> levels of medication and their effectiveness, the extensiveness of the attempts
> (medical or nonmedical) to obtain relief, the frequency of medical contacts, the
> nature of daily activities, subjective measures of credibility that are peculiarly within
> the judgment of the ALJ, the motivation of and relationship between the claimant
> and other witnesses, and the consistency or compatibility of nonmedical testimony
> with objective medical evidence.

*Id*.  The ALJ should give a conclusion and the reasons for that conclusion, explaining "why the

specific evidence relevant to each factor led him to conclude claimant's subjective complaints were

not credible," affirmatively linking credibility findings to substantial evidence in the record.  *Id*.

Further, because credibility determinations are within the province of the ALJ, a reviewing court

may not upset such findings where they are supported by substantial evidence. *See Quantu v. Barnhart*, 72 F. App'x 807, 835 (10th Cir. 2003).

While Plaintiff asserts that the ALJ did not link her opinion to reasons, the ALJ's decision shows she followed the required approach. [AR 60-61]  The ALJ rejected Plaintiff's complaints in part because she did not find them fully credible, indicating: "After careful consideration of the evidence, the [ALJ] finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for reasons explained in this decision." *Id*. at 60.  The ALJ then continued with a detailed analysis of the evidence, highlighting facts that eroded credibility. *Id*.  For example, "[T]he claimant reported that her carpal tunnel syndrome affects her ability to perform her personal care, such as washing her hair and shaving her legs.  However, the claimant reported that she grocery shops with her boyfriend, drives a car, completes household chores, plays cards, and can complete paperwork." *Id*. at 61.  The ALJ also remarked on and cited to the record regarding doctors' opinions about Plaintiff's symptom magnification and multiple discrepancies between what she did in her personal life versus what she asserted she could not do in a workplace environment.  *Id*.

> The evidence does not document disabling limitations resulting from the claimant's mental or physical impairments.  Her physicians prescribed pain medication twice a day, which the claimant only takes once a day.  She is not currently involved in physical therapy, but does exercise bands throughout the day.  The claimant is capable of completing her activities of daily living, walking to church, and taking walks throughout the day.  The claimant reports some anxiety and panic attacks.  The evidence documents that the claimant exhibits some limitations interacting with the general public and may have difficulty working on the same task as others, but more significant limitations are unsupported.

*Id*.  Ultimately, regarding credibility, the ALJ concluded:

> Although the evidence establishes that the claimant's impairments cause physical and mental limitations, there is no evidence to support that the claimant is precluded from sedentary work with additional limitations.  The residual functional capacity detailed above accommodates the claimant's limitations in lifting resulting from her wrist and shoulder pain, her reported anxiety and depressive symptoms, and her back impairment.

*Id*.

While Plaintiff argues and the Court agrees that boilerplate language is insufficient to support the ALJ's credibility determination, per *Kepler*, the ALJ's opinion is specific and does not reflect the boilerplate language that has been rejected by the Tenth Circuit.  The type of langauge *Kepler* rejected did not point to the record but merely listed generic factors, which is not the case here. Because the ALJ appropriately explained her credibility decision, and because the ALJ is the frontline assessor of credibility, the Court will not upset that decision.

Within the arguments regarding credibility, Plaintiff also challenges whether the ALJ's questioning of the VE at the administrative hearing was faulty.  Opening Brief, docket #14 at 15-16. The ALJ asked the VE: "Now, assume that I accept the Claimant's testimony that her arm aches and she can't function without sitting and standing and moving about and she can't do much of anything is what she testified to, if I accepted that, would that preclude jobs?" [AR 99] The expert answered yes.  *Id*.  Plaintiff thus argues that the VE's testimony supports disability because the ALJ found that Plaintiff's testimony was not "entirely credible," meaning the ALJ did not reject the testimony in its entirety.  Opening Brief, docket #14 at 16.  However, as Defendant argues and the Court agrees, the ALJ reasonably discounted these limitations.  Response Brief, docket #15 at 19.  The ALJ is not

required to question the VE about limitations the ALJ already reasonably discounted as part of the RFC finding.  *See Bean v. Chater*, 77 F.3d 1210, 1214 (10th Cir. 1995) ("The ALJ was not required to accept the answer to the hypothetical question that included limitations claimed by plaintiff but not accepted by the ALJ as supported by the record.")  The Court thus finds that the ALJ did not err in her questioning of the VE.

Therefore, the Court affirms the ALJ's decision on credibility.

## CONCLUSION

In sum, the Court concludes that the ALJ properly accounted for all of the restrictions in the medical opinions and properly assessed the credibility of Plaintiff's testimony.  The Court finds the final decision is supported by substantial evidence in the record as a whole and the correct legal standards were applied.  Therefore, the decision of the ALJ that Plaintiff Josephine E. Benavidez and the final order of the Commissioner are **AFFIRMED**.

Dated at Denver, Colorado this 2nd day of June, 2015.

BY THE COURT:

Michael E. Hegarty
United States Magistrate Judge

27